MEMORANDUM OF DECISION 
On December 9, 1999, the Department of Children and Families, hereafter "DCF," filed petitions for the termination of the parental rights of Diane T. and Gary D. to their daughter, Ashley T. The termination petition alleges that both parents have failed to rehabilitate, so that they could parent their daughter. Ashley was adjudicated a neglected child in prior proceedings. Connecticut General Statutes §17a-112(j)(3)(B). On October 5, 2000, Diane T. consented to the termination of her parental rights and the court accepted her consent as knowingly and voluntarily made. Trial commenced and ended on November 27, 2000. Gary D. and his counsel vigorously defended the matter. For the reasons stated below, the court grants the petition for termination of the parental rights of Diane T. and Gary D.
From the evidence presented, the court finds the following facts:
 A. FACTS 
CT Page 15428
Ashley was born on August 1995 and is now five years and four months old. At the time of her birth, her mother and father were not married. Diane was then thirty-seven years old and Gary forty-three and each has other grown children from their earlier marriages. Diane has a nineteen-year old son and Gary has three adult children. The relationship between Ashley's parents was turbulent and marked with domestic violence and drug use. DCF had been involved with the parents since 1995 concerning reports of domestic violence, substance abuse and improper supervision of Ashley. DCF also offered the parents services to deal with their problems prior to removing their daughter from their home.
Ashley was just three years old when she was removed from her parents' care on September 4, 1998, now over two years ago. On that day, Diane called her own counselor to report that she needed help with her drug addiction. When the police came to the residence, they found neither parent coherent and able to care for their daughter. Diane was admitted to the hospital on that date because of her substance abuse and her expressed suicidal thoughts. Ashley was placed in a foster home and has not again been in the daily care of her parents. Prior to her removal from the home, her father was her primary caretaker, as he was in the home receiving social security disability due to a work-related injury. He had previously been a long time employee of the U.S. Postal Service.
Six weeks after her removal from her parents' home, on October 15, 1998, Ashley was adjudicated a neglected child. At that time, the court ordered specific steps for both parents to be reunified with their daughter. For Gary D., the salient specific steps provided that he was to receive individual counseling, participate in domestic violence and anger management counseling, submit to random urine screens and undergo a substance abuse assessment. In addition, he was to follow the recommendations of the service providers regarding further treatment.[2]
DCF in 1998 and 1999 referred him to various agencies and services providers to help him accomplish the court-ordered rehabilitative steps. A substance abuse evaluation had been conducted in July, 1997, during one of the prior periods of involvment with DCF. In 1999 another such referral was made and Gary complied with the intake process, but on February 24, 1999, refused to participate in a urine screen.
A second evaluation was scheduled, as he stated he would participate, but in April, 1999 he again failed to participate fully. He also refused to submit to a hair test in August, 1999. In May, 1999, Gary attended five sessions for domestic violence issues, but was then referred to treatment elsewhere as the counselor found he had more issues concerning anger than she could address. Subsequently he completed ten counseling sessions about anger management. He also had visitation from April, 1999 to November 1999 with Ashley through the Kidsafe program, which provided CT Page 15429 him with parenting education.
However, whatever he may have learned by participating in the services to which he was sent, such participation did not prevent Gary from further acts of domestic violence. On December 8, 1999, Gary was again incarcerated, this time for violation of a protective order that had been issued against him to prevent further contact with Diane. Gary is a convicted felon with multiple arrests and convictions of disorderly conduct, assault in the second degree and violations of protective orders.[3] He was incarcerated at the time of trial and expects a release date in the near future. He did not contest the fact that he is not able to care for Ashley at the present time, but presented an alternative disposition plan to provide for his further rehabilitation and his ability to have Ashley in his full time care at some point in the future.
Ashley in the meantime was initially placed in foster care with an unrelated family. Her placement ended in August 1999 when she then came in to the home of her paternal aunt, with whom she continues to reside. Ashley is a child with specialized needs. She has been a challenge to parent, as her aunt testified. She has had difficulty sleeping through the night, had frequent temper tantrums and would lash out and hit herself in a self-abusive manner. Ashley's therapist testified that Ashley suffered from separation anxiety and is fearful of being left alone. She testified that this is an ongoing issue for Ashley who is worried about "what is going to happen and where is she going to be." She stated that Ashley is upset and confused and has said that "her Mommy did not want her and Wanda (her previous foster mother) did not want her." Permanency for this child is an important concern.
Ashley's aunt, Gary's younger sister, also testified at trial. She spoke with pride of the progress that Ashley has made. "A lot of things have gotten better. She is more relaxed and more comfortable with me." Ashley still checks on her regularly when they are at home. Ashley, she noted, "is afraid that I am going to leave her." She spoke of how Ashley would never stay in her bed but would lie on the floor with her head on a pillow out in the doorway of her room to make sure that her aunt did not leave at night after she had been put to bed. She would also get up during the night to check that she was still there. Her aunt spoke of Ashley's tantrums and how she is unwilling to share her aunt with anyone else. There have also been difficulties at her school. However, Ashley was recently placed on medication that has helped this child manage her behavior better.
Her aunt is committed to her and wishes to adopt Ashley, should she become available for adoption. Her household consists only of herself and CT Page 15430 Ashley and she has had to make significant changes in her personal life to have Ashley in her care. She believes that adoption would provide Ashley "with closure." She did report that Ashley has in the past asked about her father and that she will then talk about her brother to Ashley. She is also prepared to provide contact between Ashley and her father. She noted that she pursued having Ashley come to live with her without talking to her brother because "we are family . . . and she needs a good home." She had not at the time of trial spoken to her brother Gary about this.
Gary's relationship with his daughter was psychologically assessed as part of a court-ordered psychological evaluation, pursuant to court order. In May and June, 2000, Dr. David Mantell wrote that when Ashley and her father were together that:
 "I noted that Ashley did well with her father and was at ease and animated. The father presented himself as secure, assertive, dominating, loving, warm, playful, productive, inventive energetic and attentive to the child's appearance."[4]
During the summer, while there was still ongoing visitation with her father, Ashley frequently asked about her father and was noted to have a bond with him, even after the lengthy period of time in foster care. Nonetheless, Dr. Mantell had significant concerns about Gary's ability to parent this child and noted in an addendum to his evaluation dated June 19, 2000 that;
 I have concerns about the ability of the father to conduct himself properly with the child and not to behave in ways that would challenge the child's adjustment to the aunt's home. These are questions about the father's judgment and his psychological stability."[5]
His opinion was that Gary's clinical status was complex. In addition, he noted that Gary was in need of a psychiatric assessment and full psychological evaluation.
Dr. Krulee, also pursuant to court order, performed a psychiatric assessment of Gary on October 30, 2000 and testified at trial. Dr. Krulee, like Mantell earlier, found that Gary had a personality disorder with narcissistic and anti-social features, although he noted that Gary's symptoms did not cleanly fit the diagnostic criteria of either designation. He stated that personality disorders are very hard to change and that "you have to acknowledge the specific problems that you have." CT Page 15431 Dr. Krulee testified that Gary "tends to idealize himself and minimize his difficulties." He noted that Gary denies he has responsibility for some of his significant life problems, blaming Diane for the domestic violence and his substance abuse for his problems with the criminal justice system. Dr. Krulee noted that Gary "does not take responsibility for his anger and impulsivity." He earlier had agreed that Gary was devious, manipulative and defensive. If there are people who he feels are not worthy of him, then he is dismissive of them and gets angry at them." He testified that the personality disorder Gary has presents a significant problem in terms of caring for a child on a day-to-day basis.
He also spoke to Gary about his plans for the future. Gary told him that he planned to move to Florida, should Ashley be returned to him. Dr. Krulee questioned him several times about his sister and his daughter's need to have "some family nearby." He testified: "And he did not get it. He did not see the importance of it." Dr. Krulee said he had again inquired and said: "if it were not for your family, your child would now be in foster care. He still did not get it." Dr. Krulee noted that Gary was dismissive of the importance of family and that during his evaluation he invited Gary "on three separate times to clarify about his sister and he did not pick up on that." He stated: "it is hard to imagine him as the primary custodial parent in the foreseeable future."
Gary does not seriously contest that he had failed to rehabilitate at the time the termination petition was filed and that he is unable to have Ashley in his care at the present time. Nonetheless, he proposed an alternative disposition to termination, arguing that termination of his parental rights is unnecessary and not in his daughter's best interests. Dawn Bradley, the director of the child protection services of the Mashantucket Pequot Tribe, prepared a detailed plan out lining the option of transferring guardianship of Ashley to Gary's sister. She further spoke of the methods by which he would then have contact with his daughter and take steps to rehabilitate himself so that the child could be in his care. Ms. Bradley had available to her the DCF reports, the reports of the child's therapist and the psychological evaluation, but not the psychiatric evaluation. She also interviewed Gary and his three adult children. She focused on the reports of the bond that existed between Ashley and Gary and that the child continued to ask for him in 1999 and 2000. She testified that she did not see the necessity of terminating Gary's rights as Ashley "asks for him, knows her father and her father desires to be part of her life." In Ms. Bradley's opinion, "severing that bond would do more harm as well as the separation from her father."
She found that Gary has the capacity to rehabilitate, in part because he has been able to successfully raise three children in the past. She CT Page 15432 believes that if Gary were to follow the plans the state set for him before as well as to separate from Diane, he would be able to parent Ashley. When questioned about how long his rehabilitation would take, she stated that three months would be long enough to show whether he intends to do this and then further time would be necessary for its actual accomplishment. She admitted that Gary could go either way. Whether or not he took the necessary steps to rehabilitate was speculation on her part. She also admitted that Gary had not rehabilitated in the two years this neglect petition had been pending because he was "putting his own needs before the needs of Ashley." She further was forthright in stating that if Gary did not rehabilitate a reasonable time after a temporary transfer of guardianship, then it might be in Ashley's best interests to stay with her aunt permanently. Although she had not personally met with Ashley, she did agree that Ashley has a need for permanency.
 B. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112(j)(1). The court made such findings on October 7, 1999. The court does find, from the clear and convincing evidence, that reasonable reunification efforts had been made prior to the date of these findings. While Dr. Krulee, when questioned, did not believe that the services offered had been adequate for Gary's rehabilitation, the court does not agree. Services were offered to Gary which would have helped to address his substance abuse, had he been willing to engage in them. Further, services to deal with his anger management were provided. But Gary did not benefit from them. The efforts were further hampered by Gary's repeated refusal to participate fully. The court concludes that Gary has been unwilling and unable to benefit from services for reunification with his daughter, Ashley, as is alleged in the termination petition.
2. Adjudicatoty findings
Ashley was adjudicated neglected on October 15, 1998 and committed to the care and custody of DCF. The court further finds, by clear and convincing evidence, that as of December 5, 1999, Gary had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of his CT Page 15433 child, he could assume a responsible position in her life. Connecticut General Statutes § 17a-112(j)(3)(B). He did not fully participate in the services offered to him. He still does not accept responsibility for the difficulties in his life in the past nor does he appear to genuinely believe he requires professional help so that he could become a responsible parent.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 533
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167,554 A.2d 722 (1989), In re Hector L., 53 Conn. App. 359, 366-367,730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Gary's conduct prior to the filing of the petition, but also his conduct since that time. In this case, this was a period of not quite one year, during which time there has been no change.
Ashley clearly requires stability and permanency, which she has found in the home of her paternal aunt. She is attached to her and has now lived with her aunt for more than one year. Her aunt, the court finds from the evidence, has been able to provide for this child's needs and is committed to her care, which is not without its significant challenges at the present time. New challenges will no doubt appear in the future. The court is not so optimistic about the chances for Gary's rehabilitation as was the expert who testified on his behalf In two years. he has not demonstrated any such rehabilitation. Further, as Dr. Krulee noted, "he does not get it." The court finds that he has no understanding of Ashley's needs now or in the future for stability and permanency.
 C. REQUIRED FINDINGS 
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(k), noting that none are required for Diane, who has consented to the termination of her parental rights.
1) Appropriate and timely services were provided by DCF to the family. These include services to benefit Ashley as well as referrals for Gary to deal with issues of parenting, substance abuse and anger management. DCF also provided visitation and case management services to the parents. CT Page 15434
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and that the parents were unable to benefit from them. In addition, the court found on July 8, 1999 that further efforts for reunification were not appropriate.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Gary in the neglect proceedings. He was not able to fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Ashley is closely connected to her aunt and is in need of permanency.
5) Finding regarding the age of the child: Ashley is five years and four months old. Her birthday is on August
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Gary has not made the necessary changes in his life to accommodate the care and nurturing of this child.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for a number of years to assist this family.
 D. DISPOSITION 
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
CT Page 15435 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the one ground alleged for termination of the parental rights of the biological father of Ashley has been proven by clear and convincing evidence. Her mother has consented to the termination of her parental rights. The court has made the seven statutory findings required, which all weigh in favor of termination being in this child's best interests. The court concludes, from the clear and convincing evidence, that Ashley cannot wait any longer for permanency.
The court must also consider his best interests as to the issues raised by the request for transfer of guardianship to the paternal aunt, the alternative disposition plan offered by Gary D. Ashley's aunt seeks to adopt the child to provide her with permanency and a sense of "closure." This action requires a termination of parental rights, while leaving Ashley with the best of all possible outcomes, future contact and knowledge of her father as he is a member of her aunt's family. Ashley's aunt has demonstrated her ability to care for this challenging child. She is vocal concerning her commitment to Ashley. The court was impressed with the significant changes she has made in her own life to be able to keep Ashley within the family.
Gary would like the future return of Ashley into his care to remain open, which a transfer of guardianship would legally achieve. The court is persuaded from the evidence that Gary does care for his daughter and as noted by Dr. Krulee genuinely wishes to have her in his care." The court understands that he may well love his daughter, but that it might nonetheless be in her best interests to have her rights to him severed. Despite his professed love for his daughter, Gary has been unable to conduct himself in a way as to actualize that love into a manner of life conducive to raising Ashley. Neither the psychologist nor the psychiatrist believed that he could rehabilitate with any degree of CT Page 15436 professional probability of success. The court agrees. There is no evidence of any conduct showing that he has begun the significant personal changes necessary to be able to care for this child. As recently as the end of October of this year, he had no appreciation of Ashley's need for contact with her aunt who has provided her care. He has not only been unable in the past to put her needs ahead of his, at the present time, he is unable to understand what those needs might be. The court further finds from all the clear and convincing evidence, that it is not in Ashley's best interest to have her guardianship be transferred to her aunt and for the issue of permanency for her to remain open to a future challenge by Gary D.
Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Ashley to have permanency and stability in her life. Accordingly it is in her best interests that her parents' rights to her be terminated.
The court therefore orders that a termination of parental rights enter with respect to Diane T. and Gary D. Ashley's aunt has expressed an unequivocal desire to adopt Ashley and the court directs that she be given first consideration in any adoption, as is presently the DCF plan for Ashley. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The court further orders that a permanency plan for Ashley and a review plan for her be filed in accordance with state and federal law.
Barbara M. Quinn. Presiding Judge Child Protection Session